RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

              *Plaintiff-Appellee,*

    *v.*

                       No. 15-5085

STEVEN DWAYNE PITTMAN,

              *Defendant-Appellant.*

─────────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cr-00046—William J. Haynes, Jr., Chief District Judge.

Decided and Filed: March 11, 2016

Before: MERRITT, GIBBONS, and SUTTON, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Steven R. Jaeger, THE JAEGER FIRM, PLLC, Erlanger, Kentucky, for Appellant. Ben Schrader, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Circuit Judge. After stopping Steven Pittman's car when he failed to use a turn signal, police officers discovered cocaine in the vehicle and, later on, firearms in his home. That led to drug and gun possession charges, which led to Pittman's motion to suppress the evidence uncovered in each of the searches. The district court denied his motion. Through the course of these and other pre-trial proceedings, Pittman rejected the services of five court-appointed attorneys. When Pittman fired the last of these lawyers, the district court ruled that he

1

had given up his right to counsel, leaving Pittman to represent himself with a lawyer acting as stand-by counsel. A jury convicted him on each of the charges. Seeing no reversible errors, we affirm Pittman's conviction and sentence.

I.

On October 7, 2009, Seth Ranney of the Nashville Metro Police Department investigated a suspected drug dealer based on a tip from a confidential informant. The informant arranged to meet the suspect in a gas station parking lot and to purchase cocaine from him. The informant parked in the lot at the expected time, with Ranney and his team watching the scene. Another car (matching the description provided to the officers) arrived. It pulled up next to the informant's vehicle, then pulled away. Ranney did not see anything that would indicate a drug sale had just taken place.

Ranney, along with a few other officers, followed the suspect's car out of the parking lot, trailing it for a quarter-mile to a half-mile. The driver, without signaling, turned left into an apartment complex, and Ranney activated his lights to stop the car. Ranney approached the vehicle, telling the driver to step outside and asking whether he had anything he shouldn't have in the car. The suspect, Steven Pittman, confessed that there was cocaine in the center console. Police recovered a bag of cocaine and a digital scale. They also found over $1000 in Pittman's pocket.

An officer read Pittman his *Miranda* rights, after which he agreed to talk to the police. Pittman talked with the officers "about the drugs in the vehicle," and suggested that there might be "something else at [his] house." R. 54 at 69. Ranney asked Pittman for permission to search his home, reading aloud the department's standard "consent-to-search" form. Pittman signed the document, and the police searched his house, recovering two firearms. Ranney administered the *Miranda* warnings once again, and Pittman admitted that he had recently purchased both guns.

A grand jury indicted Pittman for being a felon in possession of a firearm and for distributing cocaine. *See* 18 U.S.C. § 922(g)(1); 21 U.S.C. § 841(a)(1). Pittman filed a motion to suppress the evidence recovered from his car and home. He claimed that the police did not have probable cause to pull him over and that they coerced him into signing the consent-to-

search form.  The district court denied the motion, reasoning that the failed turn signal provided probable cause for the stop and that Pittman consented to the search of his home.

Pittman struggled to work with the attorneys who represented him.  The court appointed Pittman's first lawyer shortly after the grand jury indicted him.  After about eighteen months, Pittman decided he wanted new representation.  He explained to the court that his lawyer had "raise[d] his voice" during a meeting and had disregarded Pittman's input in preparing for the case.  R. 226 at 5.  Rather than allowing the lawyer to withdraw, the court appointed a second attorney to act as co-counsel, hoping that the new arrangement would reduce the friction.  The new attorney's presence did not improve matters, and a few months later Pittman complained that one of his lawyers had failed to investigate his case and had given him "[m]isleading [i]nformation."  R. 84 at 2.  The court permitted both of Pittman's lawyers to withdraw and appointed new counsel.

That did not fix the problem.  Within nine months, the new attorney filed his own motion to withdraw, saying he did "not have Mr. Pittman's confidence."  R. 113 at 1.  The court granted the motion, and a new attorney (number four) entered the case on Pittman's behalf.  Past being precedent, the latest attorney soon asked to withdraw as well.  At that point, the court held a hearing to try to get to the bottom of the problem.  Pittman explained that he had trouble contacting his lawyer and was dissatisfied with counsel's advice about sentencing.  Reluctant to permit any more delays, the judge asked the attorney to continue representing Pittman and noted that counsel was "prepared for trial."  R. 235 at 14.  At the same time, the court appointed co-counsel, once again hoping that it would lead to a more productive attorney-client relationship.  The judge also informed Pittman that, as an indigent defendant, he had a right to appointed counsel but had no right to choose which attorney would represent him.

The co-counsel arrangement worked no better the second time around.  Within a month, both attorneys filed motions to withdraw, citing Pittman's dissatisfaction with their services.  The district court granted the motions, and called a status conference, where it found that Pittman had "effectively waived his right to counsel" by "refus[ing] to cooperate with five lawyers."  R. 229 at 14.  The judge asked one of the attorneys who had previously withdrawn to serve as Pittman's stand-by counsel during trial, and she agreed.  On the morning of jury selection, the

court asked Pittman whether he understood that he was proceeding pro se because of his problems with his prior attorneys.  He said he did.  The court also made sure that he understood the charges against him and the difficulties of self-representation.  He said he did.

The jury found Pittman guilty of the drug and firearm possession charges.  Before sentencing, Pittman's stand-by counsel filed a motion to withdraw, which the district court granted before appointing new stand-by counsel.  The court eventually sentenced Pittman to 235 months in prison, the lowest point on the guidelines range.  Using the services of appointed counsel, the sixth attorney to represent him, Pittman appealed.

II.

Pittman challenges his conviction on five grounds.  None has merit.

*First Motion to Suppress.*  Pittman claims that the police violated the Fourth Amendment when they stopped him for failing to signal a left turn.  Our circuit has issued conflicting decisions on whether probable cause or reasonable suspicion governs stops initiated based on traffic violations.  *Compare, e.g.*, *Weaver v. Shadoan*, 340 F.3d 398, 407–08 (6th Cir. 2003) (reasonable suspicion), *with United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (probable cause).  This complication need not detain us because, even if probable cause applies, the stop satisfied the higher standard.

The officers, as it happens, had probable cause twice over.  Nashville's municipal code provides that "[n]o person shall turn a vehicle at an intersection[,] . . . or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course, . . . without giving an appropriate signal in the manner hereinafter provided."  Nashville, Tenn., Code of Ordinances § 12.16.110(A).  That signal, the code continues, "shall be given continuously during not less than the last fifty feet traveled by the vehicle before turning."  *Id.* § 12.16.110(B).  The district court found (and Pittman does not challenge) that he failed to signal his left turn and thus violated Nashville's municipal code.

The police also had probable cause to stop him for violating a Tennessee law, which provides that "[e]very driver who intends to start, stop or turn, or partly turn from a direct

line . . . shall give a signal required in this section" whenever "the operation of any other vehicle may be affected by such movement." Tenn. Code Ann. § 55-8-143(a). "The signal required," in addition, "shall be given by means of the hand and arm, or by some mechanical or electrical device" such as a turn signal. *Id.* § 55-8-143(b). The district court found that Pittman violated these provisions because he failed to signal even though "the operation of [another] vehicle" could have been affected by his turn. *Id.* § 55-8-143(a). Ranney testified that a car approached Pittman from the other direction, and Ranney had to brake when Pittman slowed down to make the turn, which caused the car behind Ranney to brake as well. Pittman offered no evidence to rebut these claims. The district court thus reasonably concluded that Pittman's turn could have affected other cars, which means his failure to signal violated Tennessee law—and gave the officers (a second instance of) probable cause to stop him.

*United States v. Freeman* does not alter this conclusion. 209 F.3d 464 (6th Cir. 2000). Police officers pulled over a motor home after observing "one isolated incident of [the vehicle] partially weaving into the emergency lane for a few feet and an instant in time." *Id.* at 466. That sort of conduct did *not* violate a Tennessee state law that required drivers to stay "as nearly as practicable entirely within a single lane," which meant it did not give rise to probable cause. *Id.* at 465–66; *see* Tenn. Code Ann. § 55-8-123(1). Unlike the driver in *Freeman*, Pittman *did* violate traffic laws, giving the police probable cause to stop him.

Nor does it matter that the police began following Pittman because they suspected him of drug dealing. "[T]he constitutional reasonableness of traffic stops depends" on objective factors—such as the violation of traffic laws—not "on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996).

*Second Motion to Suppress.* Pittman's second motion to suppress was in effect a motion to reopen the suppression hearing to show that the police had forged his signature on the consent-to-search form. We have said, in discussing a government motion to reopen its case in chief, that "courts should be extremely reluctant to grant reopenings," *United States v. Blankenship*, 775 F.2d 735, 740 (6th Cir. 1985) (quotation omitted), and the same reasoning applies to motions to reopen suppression hearings, *see United States v. Baker*, 562 F. App'x 447, 450 (6th Cir. 2014); *see also United States v. Kithcart*, 218 F.3d 213, 219–20 (3d Cir. 2000). Pittman's

motion, filed almost eighteen months after the initial suppression ruling, did nothing to overcome this reluctance.  The district judge found that Pittman offered no "credible explanation for his failure to present th[e] . . . forgery issue earlier," R. 135 at 3, and we cannot find one either.  Making matters worse, Pittman's allegation of forgery *contradicted* his earlier claim that he had signed the consent-to-search form but had done so under duress.  Pittman's evidence also was far from compelling.  He could show only that two experts were "inconclusive" as to whether he had signed the consent form, which does not undermine the district court's earlier conclusion that Pittman agreed to the search of his home.  R. 228 at 4.  The court did not abuse its discretion in declining to reopen the suppression hearing.

In resisting this conclusion, Pittman notes that he asked his first attorney (who participated in the first suppression hearing) to raise the forgery issue, but the attorney refused.  The district court did not find this account "credible," R. 135 at 3, and, even if that were not the case, Pittman's explanation could not excuse his delayed motion to reopen.  Parties generally cannot establish "good cause" for untimely filings when their tardiness results from "a lawyer's conscious decision not to file a pretrial motion before the deadline." *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010).  The same logic applies here, and Pittman cannot rely on counsel's "conscious decision[s]" to justify his conflicting positions on the forgery issue.  *Id*.  The district court reasonably exercised its discretion in declining to reopen a suppression proceeding that had been closed for eighteen months—especially when Pittman could not draw the basic findings of that proceeding into doubt by the "inconclusive" reports offered into evidence.

*Exclusion of Expert Testimony.*  Pittman contends that the district court abused its discretion when it declined to let him offer trial testimony about the forgery issue from a government handwriting expert.  The court excluded this testimony because Pittman did not comply with Criminal Rule 16(b)(1)(C), which requires the defendant to "give to the government a written summary of any testimony that the defendant intends to use" as expert testimony.  Rule 16(d)(2) gives the court four options for dealing with violations of the rule, one of which is to "prohibit th[e] [offending] party from introducing the undisclosed evidence."  Pittman has nothing to say about the district court's finding that he never gave the required notice.  He

instead argues that the court imposed an unnecessarily harsh remedy when it excluded the testimony rather than recessing the trial as Pittman's stand-by counsel requested.

No abuse of discretion occurred. *See United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995). The court had already permitted a four-year delay between indictment and trial, granting twelve continuances in the process. Recessing the trial to remedy the Rule 16 violation would have led to still more delay. On top of that, Pittman never offered a good explanation for failing to provide notice. His attempt to prove that the signature was a forgery contradicted his earlier representations to the court; he suffered little (if any) prejudice because the court said he could offer other evidence to challenge the signature's authenticity; and the expert testimony he intended to introduce did little to undermine the signature's validity because the expert's findings remained "inconclusive." *See United States v. Hardy*, 586 F.3d 1040, 1044–45 (6th Cir. 2009). Putting all of this together, the court reasonably concluded that the best way to handle Pittman's Rule 16 violation was to exclude the proposed testimony.

It is true that courts generally seek to impose "the 'least severe sanction necessary'" and try to limit suppression of evidence "to circumstances in which it is necessary to serve remedial objectives." *Maples*, 60 F.3d at 247–48. But the district court concluded that exclusion *was* "necessary to serve remedial objectives," because it could not admit the evidence without allowing further delays and giving the government additional time to prepare a rebuttal witness. *Id.* Nor does it matter that counsel withdrew shortly before trial and that Pittman, at that point representing himself, claimed he lacked time to provide notice under Rule 16. One of the downsides of serial changes in counsel is that new attorneys (or as here the defendant himself) may advance theories inconsistent with those offered by their predecessors or adopt strategies that require changes in course. That defendants may not have time to follow these new courses wherever they lead does not prevent the court from managing the trial as it deems necessary. The district court did just that in Pittman's case, excluding the expert witness just as Rule 16(d)(2) allows.

*Right to Counsel.* Pittman claims that the court violated his Sixth Amendment right to counsel when it declined to appoint a sixth attorney before trial and required him to proceed pro se with stand-by counsel. At the same time that the Sixth Amendment "guarantees defendants in

criminal cases the right to adequate representation," it does not give "impecunious defendants . . . a Sixth Amendment right to choose their counsel." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). The Sixth Amendment thus does not demand that courts grant an indigent defendant's request for one free attorney after another, and the court may require the defendant to choose between maintaining current counsel or proceeding pro se. *United States v. Green*, 388 F.3d 918, 921–22 (6th Cir. 2004). When Pittman's fourth attorney asked to withdraw from the case, the court denied that request and warned Pittman that he had no right to continue auditioning new counsel until he found one he liked. The stakes at that point were clear: Pittman could (1) maintain his current appointed counsel, (2) hire an attorney at his own expense, or (3) represent himself. When he continued to express dissatisfaction with his lawyers and declined to hire someone new, the district court reasonably concluded that only the third option remained: proceeding pro se.

*United States v. Green* confirms that "a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a valid waiver of counsel." *Id.* at 921 (quotation omitted). The defendant in that case wanted to represent himself and also wanted the court to appoint an attorney to act as his co-counsel. *Id.* The district judge, who had already allowed the defendant's three previous attorneys to withdraw, refused to appoint co-counsel, and we held that this decision did not violate the Sixth Amendment even though it effectively required the defendant to proceed pro se. *Id.* at 921–22. *United States v. Coles* reached a similar conclusion, holding that a defendant did not have a constitutional right to demand that the court appoint new counsel for him when he had previously rejected the services of four attorneys. 695 F.3d 559, 560–62 (6th Cir. 2012).

Pittman went through more lawyers than the defendants in *Green* or *Coles*, and he never offered a reasonable explanation for sacking so many attorneys. The district court justifiably found that this conduct showed he had given up his right to counsel.

Pittman notes that he never said he wished to represent himself and indeed told the court he wanted counsel's help. But the absence of an explicit request does not prove the absence of an implicit decision. "[I]f a person is offered a choice between three things"—an appointed attorney, hired counsel, or self-representation—"and says 'no' to the first and the second, he's

chosen the third even if he stands mute when asked whether the third is indeed his choice." *United States v. Oreye*, 263 F.3d 669, 670–71 (7th Cir. 2001). That is this case.

*Waiver of right to counsel colloquy.* Pittman notes that, even if the district court could force him to choose between appointed counsel and self-representation, the choice must be an informed one. But when the court found that Pittman had given up his right to counsel, it did not—at least not initially—administer the standard colloquy used to inform pro se defendants of the difficulties of self-representation. By the time it *did* go through the colloquy—on the morning of jury selection—Pittman claims it was "too little, too late." Appellant's Br. 47.

Pittman has a point. The Supreme Court has said that, when a defendant chooses to represent himself, he "must knowingly and intelligently" give up the benefits of proceeding with counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975) (quotation omitted). We cemented that requirement in *United States v. McDowell*. 814 F.2d 245 (6th Cir. 1987). "[W]henever a federal district judge in this circuit is faced with an accused who wishes to represent himself in criminal proceedings," we said, "the model inquiry [from the *Bench Book for United States District Judges*] or one covering the same substantive points[,] along with an express finding that the accused has made a knowing and voluntary waiver of counsel, shall be made on the record prior to allowing the accused to represent himself." *Id.* at 250.

But different requirements come into play when the defendant, rather than expressly requesting to proceed pro se, gives up his right to counsel by rejecting his appointed attorneys. "[W]hen a defendant waives his right to counsel through his dilatory conduct," we have noted, "the Constitution does not require a court to engage in an extended discussion about the repercussion of the waiver." *United States v. Ross*, 703 F.3d 856, 868 (6th Cir. 2012) (quotation omitted). And we have declined to exercise our supervisory powers "to instruct district court judges how to proceed when a defendant has, by his conduct, waived his right to counsel." *Coles*, 695 F.3d at 563. In those cases, we generally "leave it to district court judges" within the bounds of reason "to determine how best to deal with [the] defendant." *Id.*

The record shows that the district court supplied Pittman with plenty of information about the risks of self-representation. When Pittman experienced problems with his first attorney, the

court told him that his lawyer "has the professional judgment" to decide "which theories of the case to pursue as a defense." R. 226 at 5. The lawyer's "professional skills," the court went on, helped him choose "[w]hether to file a motion or not" and enabled him "to make strategic decisions about trial strategy." *Id*. Problems could arise if the attorney felt that his "professional judgment was being called into question on a subject for which the client is really not qualified to express[.]" *Id*. at 5–6. The court also repeatedly informed Pittman that his attorneys had represented his interests aggressively, helping him to grasp the benefits of maintaining counsel. The district judge told Pittman that his first attorney "had raised a lot of issues on [his] behalf" and had "pursu[ed] a vigorous defense," which meant that replacing him "would be to [Pittman's] detriment." *Id*. at 7. At a later hearing, the court admonished that "[a]ll of the lawyers" who had represented Pittman were "competent counsel" and that his current attorney was "doing everything on his behalf to improve [Pittman's] prospects." R. 235 at 8–9. In the same breath, the court stated that "[s]entencing matters under the guidelines"—including several issues with which Pittman seemed particularly concerned—"can be very complicated," warning Pittman about the dangers of second-guessing counsel's advice on such matters. *Id*. at 9. On this record, Pittman had every reason to appreciate the risks of self-representation, making his choice between maintaining appointed counsel and proceeding pro se an informed one.

Pittman invokes *United States v. Clemons* for the proposition that courts must administer the *Bench Book* colloquy no matter what. 173 F.3d 856, at *4 (6th Cir. 1999) (unpublished table disposition). *Clemons*, it is true, said that district courts have "an absolute duty under *McDowell* to explicitly inquire whether [defendants] underst[and] the risks of self-representation." *Id*. But that language from an unpublished opinion contradicts our published decision in *Coles*, which "le[ft] it to district court judges to determine how best to deal with a defendant, who by his or her conduct, has waived the right to counsel." 695 F.3d at 563. Wise though it may have been to engage in the *Bench Book* colloquy at that point, its absence does not automatically create reversible error, particularly when the judge took other precautions to ensure that the defendant knew the perils of self-representation.

The district court, it's worth adding, did administer the *Bench Book* colloquy to Pittman before trial. But this discussion came after Pittman had already given up his right to counsel.

Although we decline to impose specific requirements on judges faced with intransigent defendants, we encourage district courts to make them aware of the consequences of persistent, unreasonable refusals to cooperate with appointed counsel—and to inform them of the difficulties of self-representation—*before* requiring them to proceed pro se.

For these reasons, we affirm.