IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 3, 2016 Session

## STATE OF TENNESSEE v. JOSHUA ANDREW MANSFIELD

**Appeal from the Circuit Court for Haywood County**
**No. 7332     Clayburn Peeples, Judge**

_____

**No. W2015-01663-CCA-R3-CD  -  Filed June 22, 2016**

_____

The Defendant-Appellant, Joshua Andrew Mansfield, entered a guilty plea to possession of marijuana with intent to sell or deliver in exchange for a sentence of one year of incarceration at thirty percent release eligibility and a $2,000 fine.  As a condition of his plea, Mansfield reserved a certified question of law challenging the denial of his motion to suppress, which alleged that he was unconstitutionally seized and detained.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee (at trial and on appeal); and Steven E. Farese, Sr., Ashland, Mississippi (at trial), for the Defendant-Appellant, Joshua Andrew Mansfield.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Garry G. Brown, District Attorney General; Mark Hazelwood and Hillary Lawler Parham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

On July 21, 2014, Deputy Omar Jundi, an officer of the Fayette County Sheriff's Department and the West Tennessee Violent Crime and Drug Task Force, initiated a traffic stop in Haywood County on a red Ford Mustang with Texas license plates driven by Mansfield.[1]  In a subsequent search of the vehicle, approximately six pounds of

---

[1]  We acknowledge that we do not use titles when referring to every witness.  We intend no disrespect in doing so.  Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended.  He would prefer that every adult witness be referred

marijuana was discovered inside a duffel bag in the trunk. Based on this discovery, Mansfield was arrested and charged with one count of possession of marijuana with intent to sell or deliver. See T.C.A. § 39-14-417. Mansfield filed a motion to suppress all evidence obtained from the traffic stop, arguing that Deputy Jundi unlawfully seized and detained him without reasonable suspicion.

At the suppression hearing, Deputy Jundi testified that on July 21, 2014, he was traveling eastbound in the right lane of Interstate 40 (I-40) at approximately 70 miles per hour when he was "cut off" by Mansfield's red Ford Mustang near mile marker 46. Deputy Jundi stated, "the red Mustang just put their turn signal [on] and immediately changed lanes in front of me where I had to push my brake." He emphasized that there was no pause between the turn signal and lane change and that Mansfield did not check the right lane of traffic before merging. Deputy Jundi subsequently initiated a traffic stop based on an improper lane change.

On cross-examination, Deputy Jundi testified that the first time he saw Mansfield's vehicle was when Mansfield cut him off in the right lane. However, upon reviewing his testimony from Mansfield's preliminary hearing, he clarified that he first saw Mansfield's vehicle passing him in the left lane. When pressed, he later admitted that he observed Mansfield switch from the right lane to the left lane when he pulled onto the interstate prior to Mansfield cutting him off in the right lane. He conceded that he would have had to have been traveling behind Mansfield in the right lane at some point in time but denied that he was following Mansfield. He noted that there was no video of what occurred prior to the traffic stop because his dashboard video camera had been broken and under repair for several months. When Deputy Jundi was asked whether he had to "tap," "slam," or "stand on" his brakes when Mansfield merged in front of him, he responded, "I pushed my brakes." He further testified that there had been prior occasions where he had pushed his brakes when another vehicle merged into traffic and that he "possibly" stopped those vehicles for an improper lane change as well.

Deputy Jundi explained that during the stop, he chose to extend his investigation of Mansfield further after observing Mansfield's "overly nervous behavior." He noted that "[Mansfield's] hands were shaking," which was consistent with the video recording of the stop taken from Deputy Jundi's body camera. The recording, which was played in its entirety at the suppression hearing, showed that Deputy Jundi approached Mansfield's vehicle and asked for Mansfield's driver's license and registration, which Mansfield produced. Deputy Jundi told Mansfield that he pulled him over "[be]cause [Mansfield] kind of literally cut across right in front of [him] and [he] had to slam on [his] brakes." As Mansfield started to respond, Deputy Jundi continued, "I mean, I was in the slow lane

to as Mr. or Mrs. or by his or her proper title.

and you went to the fast lane and then all [of] the sudden you come back into the slow lane." Mansfield responded that he changed lanes to get away from an abandoned vehicle on the side of the road. Deputy Jundi then questioned Mansfield about where he was going and how long he planned to stay. Mansfield responded that he was going to Virginia to visit his mother for "hopefully a week" and handed Deputy Jundi his proof of insurance.

Deputy Jundi then asked Mansfield several times about his criminal record, and Mansfield responded each time that his record was clean. Deputy Jundi also asked if Mansfield had anything illegal in the car or "anything [his] dog would alert [him] to," and Mansfield consistently responded, "No, sir." Deputy Jundi asked Mansfield to step outside of the vehicle and stated aloud that Mansfield was shaking. When he asked Mansfield why he was shaking, Mansfield said that he had been driving since 3:00 a.m. and had been drinking Mountain Dew. Deputy Jundi continued to question him about his record, and Mansfield eventually disclosed that he had two convictions for driving while intoxicated, the most recent from five years prior. Deputy Jundi asked again if Mansfield had anything illegal for "personal use" inside his vehicle, and Mansfield replied, "No, sir." Deputy Jundi then asked if he could run his dog around the vehicle and before Mansfield responded, Deputy Jundi added, "Here's the deal, brother, let's save you and myself the trouble. If there's anything in there – personal use for you, [I'll] let you smash it and you'll be going on your way."

At that point, slightly under three minutes after Deputy Jundi approached his vehicle, Mansfield admitted that he "ha[d] one little roach" located in the ashtray. After Mansfield answered twice that there was no additional contraband in the vehicle, Deputy Jundi called for backup and another officer arrived around two minutes later. Deputy Jundi then presented Mansfield with a consent to search form, asked him to read and sign it, and offered to answer any questions. Deputy Jundi again asked Mansfield how long he was going to be in Virginia, and Mansfield responded consistently, "one week." Three officers then searched Mansfield's vehicle and located a marijuana roach inside of the ashtray. Approximately three and half minutes into the search, the officers also found a black duffel bag in Mansfield's trunk that contained several pounds of marijuana inside clear, vacuum-sealed bags. At that point, Mansfield was handcuffed and read his Miranda rights.

When testifying about the stop, Deputy Jundi initially stated that he did not have consent to search Mansfield's vehicle but that he had probable cause to search based on Mansfield's admission that there was a small joint in the ashtray of his vehicle. He clarified on cross-examination that he did in fact have Mansfield sign a consent form. Deputy Jundi further testified that Mansfield first stated that he was traveling to Virginia for ten days but later said that he was going for seven days and that this inconsistency

made him suspicious of Mansfield. However, he did not know that this testimony was inconsistent with the video evidence. Deputy Jundi agreed that the initial traffic stop turned into an investigative stop and that the only reason he took his investigation of Mansfield further was because Mansfield was nervous. He also agreed that he could have run his dog around Mansfield's car without Mansfield's permission but denied that he asked for permission in order to threaten Mansfield into consenting to a search.

On cross-examination, Deputy Jundi confirmed that there was an abandoned car on the side of the road at the time of the stop and that Mansfield had told him that he switched lanes in order to avoid the car. He further agreed that he could have written Mansfield a ticket for the traffic violation at the point in time that he asked Mansfield to step out of his vehicle but chose to continue questioning Mansfield instead. Deputy Jundi admitted that his job was focused on drug interdiction and other criminal activity and that it was not his job to issue traffic tickets. However, he denied that he issued warning tickets for traffic violations only when the search of a vehicle turned up no contraband. Deputy Jundi noted that he did not write Mansfield's warning ticket until after Mansfield had been arrested for the possession of drugs. He said that he gave Mansfield a warning instead of an actual citation because "[he] didn't want to add more violations and more tickets than [Mansfield] already had." He agreed that Mansfield was cooperative and gave him all of the information he asked for.

Mansfield, testifying on his own behalf, explained that on July 21, 2014, he was driving eastbound on I-40 in the left lane behind three other vehicles when he noticed Deputy Jundi's vehicle sitting still in the median less than a mile ahead. Once he had driven a half mile past Deputy Jundi's vehicle, he noticed the vehicle pull onto the interstate. He then switched into the right lane and watched the vehicle in his rearview mirror. Mansfield noted that the vehicle first pulled onto the left lane but eventually moved over behind him and rode his bumper in the right lane. He noticed a white car broken down on the right side of the interstate, and he used his turn signal and merged into the left lane. A few seconds after he passed the car, Mansfield used his turn signal again, "looked over" and determined that "[i]t was clean," and merged back over into the right lane. Mansfield testified that he never cut off Deputy Jundi when he merged back into the right lane. Regarding the stop, Mansfield testified that he was compliant with Deputy Jundi and that he was "[n]ot overly nervous." However, he noted that he had been drinking Mountain Dew and felt like he was "being stalked" and "treated unfairly." He further stated that he only admitted that he had a marijuana roach in his vehicle because "[Deputy Jundi] told me that he was going to run his dog around my vehicle and it would be better – if I was upfront and honest[,] he would let me go." Based upon Deputy Jundi's statements, Mansfield agreed to the search of his vehicle.

After reviewing the video evidence and hearing arguments from counsel, the trial court denied Mansfield's motion to suppress. Mansfield subsequently entered a negotiated guilty plea on August 17, 2015, and, pursuant to Tennessee Rule of Criminal Procedure 37(b)(2), he properly reserved the following certified question of law for our review:

> Did the Court err in not granting Defendant's Motion to Suppress based on the initial stop and seizure (i.e., turning on the blue lights), and the continued detention and search, not being supported by reasonable articulable suspicion or probable cause for the stop, searches and/or seizures[?] This is a dispositive question because if the stop and/or seizure was invalid, all evidence of the possession of marijuana would be suppressed and the State would have no evidence to proceed on a prosecution of its case. The conviction would be invalid.

A timely notice of appeal was filed on August 24, 2015.

## ANALYSIS

On appeal, Mansfield contends that the trial court improperly denied his motion to suppress. Specifically, he argues that Deputy Jundi lacked reasonable suspicion to initiate a stop of his vehicle. He further contends that the continued detention of his vehicle exceeded the purported scope of the stop in violation of his constitutional rights.

The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41

S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

**A. Validity of the Traffic Stop.** First, Mansfield challenges the validity of Deputy Jundi's initial stop of his vehicle. Specifically, he argues that the traffic stop initiated by Deputy Jundi was pretextual because he did not violate any traffic laws. In support, he emphasizes that Deputy Jundi conceded that Mansfield used his turn signal when he changed lanes and that Deputy Jundi was a drug task force officer whose job duties did not generally include writing traffic tickets. The State responds that the seizure was proper because Deputy Jundi had probable cause to initiate a traffic stop after observing Mansfield commit a traffic offense.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. A warrantless search or seizure is presumed unreasonable and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). The State bears the burden of proving that one of the exceptions to the warrant requirement exists. State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (citing Yeargan, 958 S.W.2d at 629).

In the context of a traffic stop, the Tennessee Supreme Court recently confirmed that "a police officer's traffic stop of a motorist will pass constitutional muster if the officer has 'probable cause' to believe that the motorist has committed a traffic offense." State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016) (citing State v. Vineyard, 958 S.W.2d 730, 736 (Tenn.1997) (holding that officers' observation of a defendant's violations of traffic laws created probable cause to stop defendant)); see also United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996) (recognizing that even minor traffic violations create probable cause to stop the driver); Berrios, 235 S.W.3d at 105 (recognizing that, "[a]s a general rule, if the police have probable cause to believe a traffic violation has occurred, the stop is constitutionally reasonable" (citing Whren v. United States, 517 U.S. 806, 810 (1996))). "Articulating precisely what ... 'probable cause' mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996). Instead, "probable cause is a 'practical, nontechnical' concept." Smith, 484 S.W.3d at 400 (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983))). Moreover, "probable cause exists when 'at the time of the [seizure], the facts and circumstances within the knowledge of the officers, and of which they had reasonably

trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" State v. Dotson, 450 S.W.3d 1, 50 (Tenn. 2014) (quoting State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012).

The traffic stop in the present case stems from an improper lane change. In relevant part, Code section 55-8-143, which governs the procedures for proper lane changes, states,

> (a) Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal required in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.
>
> . . . .
>
> (c) These signals shall be given continuously for a distance of at least fifty feet (50') before stopping, turning, partly turning, or materially altering the course of the vehicle.

T.C.A. § 55-8-143(a), (c). In finding that the stop was lawful, the trial court credited the testimony of Deputy Jundi that he pulled Mansfield over after he observed Mansfield commit a violation of section 55-8-143. Though the court noted various inconsistent statements by Deputy Jundi regarding when and where he first observed Mansfield's vehicle, the trial court found these inconsistencies to be inconsequential.

Upon review, we conclude that the evidence does not preponderate against the trial court's findings. Here, Deputy Jundi, whose testimony the trial court credited, stated that Mansfield simultaneously activated his turn signal and merged into the right lane without checking if the right lane of traffic was clear, causing Deputy Jundi to push his brakes to avoid coming too close to Mansfield's vehicle. This testimony is corroborated by the video evidence, in which Deputy Jundi stated that he pulled Mansfield over "[be]cause [Mansfield] kind of literally cut across right in front of [him] and [he] had to slam on [his] brakes." Though Mansfield disputes that a traffic offense occurred, his testimony was discredited by the trial court. Because the record supports that a traffic violation occurred, Deputy Jundi had probable cause to initiate a stop. See Vineyard, 958 S.W.2d at 736; see also United States v. Pittman, 816 F.3d 419, 423-24 (6th Cir. 2016) (holding that the violation of section 55-8-143 provided law enforcement officers sufficient reasonable suspicion to support a traffic stop, where the defendant driver made a left-hand turn without signaling, causing other vehicle to have to brake as a result). Although Mansfield contends that the stop was pretextual, the existence of probable

cause rendered the stop lawful irrespective of Deputy's Jundi's subjective motives. See Vineyard, 958 S.W.2d at 735-36 (holding that an officer's observation of a traffic violation provided probable cause to initiative a traffic stop "without regard to the subjective motivations" of the officer); see also State v. Antoinette Feaster, No. M2009-01284-CCA-R3-CD, 2010 WL 2852284, at *4 (Tenn. Crim. App. July 21, 2010) (citing Whren, 517 U.S. at 813-17; Vineyard, 958 S.W.2d at 734-35) ("If the officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if the stop is a complete pretext for the officer's subjective motivations in making the stop."). Accordingly, Mansfield is not entitled to relief.

**B. Length of the Detention.** Next, Mansfield argues that Deputy Jundi's "continued detention and search [of Mansfield's vehicle] exceeded the purported scope of the stop and was therefore in violation of Mansfield's constitutional rights." In analyzing this issue, we note that a traffic stop is an investigative stop; therefore, an officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). Furthermore, the detention "must be temporary and last no longer than necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983); see also State v. England, 19 S.W.3d 762, 767-68 (Tenn. 200). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998) (citation omitted). "[N]o hard-and-fast time limit exists beyond which a detention is automatically considered too long, and, thereby unreasonable." State v. Justin Paul Bruce, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215, at *4-5 (Tenn. Crim. App. Aug. 22, 2005).

A police officer making a constitutionally permissible traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having a reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop. State v. Harris, 280 S.W.3d 832, 842 (Tenn. Crim. App. 2008) (citing State v. Walker, 12 S.W.3d 460, 464 (Tenn. 2000)). "If the time, manner or scope of the investigation exceeds the proper parameters," a constitutionally permissible stop may be transformed into an impermissible stop. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002); see also Antoinette Feaster, 2010 WL 2852284, at *6 ("A detention can lose its lawful character if it extends beyond the time reasonably necessary to effect its initial purpose."). However, this Court has previously held that "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Moran Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App. Feb. 20, 2002) (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258,

268 (6th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998)), rev'd on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003).

On appeal, Mansfield contends that he was visibly calm in the recording of the traffic stop and that nothing otherwise supported his continued detention. In rejecting this assertion, the trial court determined that the traffic stop was not unreasonably extended by Deputy Jundi's questioning of Mansfield, and the evidence does not preponderate against this finding. Here, Deputy Jundi had probable cause to stop Mansfield based on a traffic violation. Given that the stop was lawful, it was permissible for Deputy Jundi to request that Mansfield step outside of his vehicle and to briefly question him about matters unrelated to the traffic stop "so long as those inquiries [did] not measurably extend the duration of the stop." Berrios, 235 S.W.3d at 107 (citing Pennsylvania v. Mimms, 434 U.S. 106, 109-11 (1997)); see also State v. Donaldson, 380 S.W.3d 86, 94 n.7 (Tenn. 2012) (citing Muehler v. Mena, 544 U.S. 93, 100-01 (2005)). Here, Deputy Jundi questioned Mansfield for approximately two and a half minutes before Mansfield admitted to having marijuana in his vehicle. Moreover, the duration of the stop in its entirety prior to the discovery of additional contraband in the trunk of Mansfield's vehicle was slightly over twelve minutes. Given the brevity of the stop and the fact that Deputy Jundi's actions were not beyond the scope of what the law permits, we conclude that Deputy Jundi did not unreasonably detain Mansfield. Accordingly, he is not entitled to relief.

## CONCLUSION

Based on the above authority and analysis, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE