NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0208n.06

Case No. 25-5175

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 07, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| SEAN CHRISTOPHER WILLIAMS, | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: READLER, DAVIS, and BLOOMEKATZ, Circuit Judges.

READLER, Circuit Judge. On four occasions, the district court appointed counsel to represent Sean Christopher Williams in his criminal prosecution, only to have counsel later withdraw due to Williams's refusal to cooperate. Williams also clashed repeatedly with the district court. This collection of events led the court aptly to characterize Williams as aiming "in seemingly any way possible—to s[o]w chaos and refuse to cooperate in the hopes that he can somehow obtain some relief on appeal" from his conviction at trial, where Williams appeared pro se. R. 145, PageID 1542. We decline to grant him the relief he now seeks.

I.

Williams was indicted for possessing ammunition in violation of 18 U.S.C. § 922(g)(1). The district court appointed counsel for Williams. That relationship, however, would not last.

Less than one month later, counsel asked to withdraw in light of "a complete deterioration of the attorney-client relationship." R. 22, PageID 87.

Intervening events, it turns out, had dramatically complicated counsel's ability to represent Williams against the § 922(g)(1) charge. At the same time he was being charged with his ammunition offense, Williams was also being investigated for allegations that he committed various sex and child pornography offenses. *See United States v. Williams*, No. 25-5174. For the § 922 case, counsel eventually came to believe that he could no longer work with Williams. One feature driving that conclusion was the fact that counsel had refused Williams's "demand[]" that counsel help Williams prepare and sit for a media interview tied to the sex offense investigation. R. 215, PageID 3186–87. Counsel recommended against doing the interview, but Williams pursued the option anyway. The district court recognized that there was a breakdown of the attorney-client relationship because Williams was directly flaunting his attorney's advice, so the court allowed his counsel to withdraw. The district court also warned Williams that "no attorney this Court appoints is going to be required to be present for any sort of television interview with you." *Id.* at PageID 3188.

The district court then appointed new counsel for Williams. In so doing, it reminded Williams that his new counsel (like his previously appointed counsel) was an experienced criminal defense attorney, meaning Williams "would be well-served to listen to [counsel's] advice." *Id.* at PageID 3190. The court also warned Williams that "if you cannot have a good attorney/client relationship with an appointed attorney, the Court can only appoint [counsel] so many times for you and you may be left with representing yourself." *Id.*

From there, Williams's legal problems worsened. Some stemmed from the aforementioned investigation, which resulted in Williams's indictment on three counts of producing child

2

pornography. Others were the product of Williams's elusive behavior. For one, a grand jury indicted Williams for attempting to escape from a local jail where he was being held in federal custody. For another, Williams, while en route to a hearing in federal court, managed to jump out of the van transporting him from jail to the courthouse. A multi-state manhunt ensued. Following Williams's eventual recapture, a new indictment was issued for his escaping federal custody. (This new indictment, we note, dropped the original § 922(g)(1) charge that began this whole saga.)

Williams's new counsel would also move to withdraw, citing an irrevocable strain in the attorney-client relationship. At a hearing held to address counsel's request, the district court again reminded Williams that "[y]ou do not have the right to counsel of your choice unless you are paying for that counsel." R. 216, PageID 3225. And after agreeing to allow counsel to withdraw and making yet a third appointment for Williams, the court warned Williams that it did not "intend to appoint anyone else to represent" him going forward. *Id.* So if Williams could not maintain a productive relationship with his new (and third) counsel, he would "likely be representing [him]self on a pro se basis from here." *Id.* In an effort to dissuade Williams from pursuing that option, the court advised him that conducting his defense pro se would be "a very difficult undertaking." *Id.* at PageID 3226.

Past being prologue, Williams's rocky relationship with his appointed counsel would continue. In a letter to the court, Williams complained that his new counsel was unresponsive and had refused to request discovery materials Williams sought. Williams's letter prompted yet another hearing before the district court. Back in court, Williams asked that new counsel be appointed to represent him. Over a lengthy hearing, Williams rehashed many of his complaints with prior counsel as well as issues arising in his unrelated cases. At the hearing's close, the district court denied Williams's demand for new counsel. With respect to discovery documents, the

3

district court concluded that some of Williams's requests were related to the pending charges in a separate case, not this one. As for documents counsel claimed to have already given Williams, the court instructed Williams's counsel to give Williams new copies of the materials. The court notified Williams that any subsequent request to remove his attorney would require Williams to represent himself. With these instructions in place, the district court considered Williams's complaints settled.

Settled they were not. Despite the district court's latest warning, Williams proceeded to discharge his counsel and file a misconduct complaint against the lawyer with a state professional responsibility board. Those events prompted yet another hearing. There, the district court recognized that Williams's decision to file a bar complaint against his attorney and his repeated communications problems with counsel required the court to allow appointed counsel to withdraw. The court also worried, understandably so, that Williams would not "get along with any lawyer" given his repeated disagreements with three prior attorneys. R. 168, PageID 1885. Nevertheless, the court, reasoning that it could not say for certain whether Williams was the underlying cause for his two prior attorneys' withdrawals, proceeded to appoint new counsel for Williams. At the same time, the court again warned Williams that he could not further delay the proceeding by refusing to work with counsel. As a result, if Williams's behavior caused his relationship with his new lawyer to break down, the court would deem his right to counsel waived by conduct. That said, proceeding pro se, the court admonished Williams, would be risky—Williams lacked the knowledge, experience, and familiarity with a criminal trial to provide a better defense for himself than an attorney, and the court would be unable to provide him guidance in conducting his defense. All in all, the court concluded, Williams would be better served by cooperating with his new counsel.

Williams, however, had other priorities. He used that same hearing as an opportunity to relitigate earlier complaints regarding counsel. And he raised new ones ranging from failing to respond to text messages to not pursuing legal theories proposed by Williams. This meandering conversation frustrated the district court. As the court described the exchange, Williams was "talking in circles" and repeatedly "demanding things . . . that ha[d] absolutely nothing to do with" this case as opposed to his pending child pornography charges. *Id.* at PageID 1864, 1870. After an hour of discourse, during which Williams frequently interrupted the court and refused to give straight answers, the court warned Williams that if he "open[ed] [his] mouth again, I'll have the marshal gag you." *Id.* at PageID 1880. Nonetheless, Williams largely ignored the court's command.

History would repeat yet again. Two weeks before Williams's trial, his latest attorney moved to withdraw. According to counsel, Williams refused to discuss the case with him, seemingly to undermine counsel's ability to provide an adequate defense. Counsel worried that Williams appeared to be preparing for a post-conviction appeal or collateral attack, with his counsel as the "fall guy." R. 220, PageID 4388. Williams, however, remained adamant that he wanted counsel to continue to represent him. He claimed that his refusal to cooperate was due to counsel denying Williams's request for discovery materials. During a hearing on the motion to withdraw, Williams again talked over the district court. As this was the fourth instance where the attorney-client relationship had broken down, the court again reminded Williams of its prior warning that he would be required to represent himself if he could not cooperate with his attorney. Yet based on Williams's statements that he still wanted his counsel to represent him, the district court denied the motion to withdraw.

A week later, Williams's counsel for a second time moved to withdraw, again due to Williams's refusal to discuss the case in any meaningful way. Instead, counsel lamented, Williams devoted his conversations with counsel to requesting that he file frivolous motions and raise irrelevant legal defenses. During those meetings, Williams called counsel ineffective and suggested that counsel should lose his license. The district court initially denied the motion due to counsel's failure to demonstrate that the breakdown in the relationship was irreparable. Counsel sought reconsideration. In making that request, counsel highlighted a few other examples of Williams's belligerence: He screamed during meetings with counsel, repeatedly stated in response to counsel's advice that his counsel was ineffective, so he was going to get what he wanted in his appeal or a collateral proceeding, and passed gas to interrupt counsel's explanation of a possible defense theory.

During a subsequent hearing, counsel reiterated that Williams had made his representation impossible. The district court agreed. Williams, the court explained, had set out on a deliberate, intentional plan to undermine these proceedings by his lack of cooperation with and his demands upon his court-appointed counsel. Williams's disruptive behavior during the hearing resulted in yet another warning that he would be gagged if he continued to interrupt, one more admonition Williams would disobey.

Having determined that Williams had knowingly and voluntarily waived his right to counsel despite repeated warnings about the risks of doing so, the district court granted a one-week continuance of his trial. Williams responded with a bevy of motions reiterating many of his prior requests. This exchange resulted in another multi-hour hearing in which Williams, while talking over the court, attempted to relitigate issues the court had already decided. Williams was instructed that if his behavior continued at trial, the court would cut off his microphone. Williams was also

scolded for making faces during the hearing. After the court denied all of Williams's motions, Williams moved for the district court judge's recusal, citing the judge's alleged prejudice against Williams. The court denied that motion, as well.

Williams's trial conduct mirrored that displayed in his prior hearings. During his opening statement, Williams regularly ignored the district court's orders and discussed matters that the court instructed him not to address before the jury. Initially, the district court allowed Williams "a little leeway" in light of his pro se status. R. 224, PageID 3839. But Williams continued to ignore the court's admonitions, which resulted in the court eventually cutting off his statement. The next day, before the jury arrived, Williams attempted to relitigate the court's pretrial rulings while again interrupting and talking over the court, prompting the court again to threaten to gag Williams and have standby counsel conduct his defense. The court told Williams that it was "tired of the games" and "tired of you talking over me." R. 225, PageID 3907. Further disruptions, the court explained, would result in Williams being removed from the courtroom, leaving him to watch the trial via video. Before the jury, Williams continued to obstruct the proceeding, including by testifying while conducting cross-examination. The district court warned Williams that it had "about had enough of [his] side comments," but took no further action to reprimand Williams. *Id.* at PageID 3933.

In his closing statement, Williams admitted to his escape charge but asked the jury to find him not guilty of attempted escape. The jury obliged, acquitting Williams of attempt and convicting him of escape. The district court sentenced Williams to 60 months' imprisonment to run consecutive to the 1,080 months it sentenced Williams to in his child pornography case.

Represented by counsel once more, Williams appealed. Before us, he argues that he did not waive his right to counsel and that the district court was biased against him. We take each argument in turn.

## II.

The Sixth Amendment embodies a foundational value in our system of criminal justice: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. Like most rights, however, the right to counsel can be waived if the purported waiver is knowing and intelligent. *Faretta v. California*, 422 U.S. 806, 835 (1975) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938)). Here, the district court found that Williams waived his right to counsel through his repeated refusal to cooperate with his appointed counsel. We review the district court's waiver finding de novo. *See United States v. Spence*, 167 F.4th 882, 887 (6th Cir. 2026) (citing *United States v. Johnson*, 24 F.4th 590, 600 (6th Cir. 2022)).

A. In addition to his words, a defendant can also waive the right to court-appointed counsel through his conduct. *United States v. Coles*, 695 F.3d 559, 562 (6th Cir. 2012). The right to counsel for the indigent, it bears reminding, is a right to "adequate representation." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). But it is not a "right to choose [one's] counsel." *Id.* "The Sixth Amendment thus does not demand that courts grant an indigent defendant's request for one free attorney after another." *United States v. Pittman*, 816 F.3d 419, 425 (6th Cir. 2016) (citing *United States v. Green*, 388 F.3d 918, 921–22 (6th Cir. 2004)). So when a defendant cycles through counsel, the district court can present the defendant with a choice: Work with your current court-appointed attorney, hire your own lawyer, or proceed pro se. *Id.* (holding that a "court may require the defendant to choose between maintaining current counsel

or proceeding pro se"). The refusal to choose one of the first two options is an implicit decision to accept the third—self representation. *Id.* at 426 (quoting *United States v. Oreye*, 263 F.3d 669, 670–71 (7th Cir. 2001)).

Williams's conduct waived his right to court-appointed counsel. His first two attorneys were forced to withdraw when their respective relationships with Williams disintegrated. Those collapses were byproducts of Williams's actions. Among them, he made demands for services outside the scope of counsel's representation and refused to heed counsel's advice. At each turn, the district court reminded Williams that he was not entitled to audition a stream of lawyers until he found one whose legal advice he wanted to follow. So the district court properly put Williams on notice that a continued refusal to heed counsel's advice or repeated unreasonable demands would risk being forced to proceed pro se.

Williams's conduct with respect to his final two attorneys confirms that he waived his right to appointed counsel. After being warned by the district court that any refusal to cooperate with his next lawyer would mean that Williams would "likely be representing [him]self on a pro se basis from here," Williams filed a frivolous bar complaint against his new attorney, forcing the lawyer to withdraw. R. 216, PageID 3225. The court deemed Williams's actions tantamount to a "deliberately manufactured . . . conflict of interest with" counsel based on unreasonable demands. R. 104, PageID 1219. Nevertheless, Williams was afforded one more shot at working with court-appointed counsel. At the same time, he received "a fourth and ***final*** warning" that if either he or his attorney dissolved the attorney-client relationship, he would be forced to represent himself. *Id.* at PageID 1223. Yet even then Williams's conduct did not improve: He screamed at his now fourth lawyer, passed gas in response to questions, and refused to discuss his case with counsel. Like the defendants in *Pittman* and *Coles*, Williams repeatedly took steps that made the continued

9

assistance of court-appointed counsel impracticable. *See Pittman*, 816 F.3d at 422 (noting Pittman refused to cooperate with five separate lawyers and repeatedly second-guessed their strategic decisions); *Coles*, 695 F.3d at 560–61 (noting Coles's relationship with three attorneys broke down and he rejected the assistance of a fourth). The district court therefore had a firm factual basis for determining that Williams's "endgame appear[ed] to be to leave the Court with no alternative but to rule that he has waived his right to court-appointed counsel and to order him to represent himself at trial, so he can then play the victim on appeal." R. 145, PageID 1542–43.

Like the district court, we have no trouble concluding that Williams's behavior amounted to a "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel" that "functioned as a valid waiver of the right to counsel." *Green*, 388 F.3d at 921–22 (citation modified). At every turn, Williams made unreasonable demands of his attorneys, refused to cooperate with them, and contrived conflicts, all with the apparent goal of undermining their efforts and developing an ineffective assistance of counsel claim. And he did all of this in the face of repeated warnings that his actions risked waiving his right to counsel. Taken together, Williams's actions were more than enough to amount to a waiver of that right. *See Pittman*, 816 F.3d at 426; *Green*, 388 F.3d at 922.

Seeing things otherwise, Williams argues that he never agreed to waive his right to counsel; instead, he simply reiterated to the district court his desire to have court-appointed counsel continue to represent him despite their motions to withdraw. But a defendant's actions can betray his words. *Pittman*, 816 F.3d at 426 (quoting *Oreye*, 263 F.3d at 670–71). *Pittman* serves as an example. There, as here, the defendant told the district court he wanted appointed counsel all the while forcing attorney after attorney to withdraw. *Id.* Pittman's repeated actions, we concluded, trumped his words to the contrary, especially in light of the district court's warnings that if

Pittman's behavior continued he would waive his right to counsel. *Id.* at 425–26. So too here. Faced with the choice of cooperating with his current counsel, hiring his own lawyer, or representing himself, Williams's conduct amounted to a rejection of the first two options, leaving him with the third.

B. As a fallback, Williams contends that even if he did waive his right to counsel, his waiver was not knowing and intelligent because he was not given the complete warning required by *Faretta v. California*. In our Circuit we interpret *Faretta* to require a district court faced with a defendant who seeks to represent himself to conduct the model inquiry (or something substantially similar) outlined in the *Benchbook for United States District Courts*. *Pittman*, 816 F.3d at 426 (quoting *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987)); *United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017) (quoting *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004)). The *Benchbook*, in turn, instructs a district court judge to ask the defendant about his legal studies, his experience with criminal law, the implications of his waiver, and whether the decision to waive counsel is entirely voluntary (among other things). *Benchbook for United States District Courts* 27–28 (7th ed. 2026). But our practice of requiring the *Benchbook* inquiry does not extend to the unique instance where a defendant steadfastly maintains that he wants appointed counsel while betraying that assertion with his actions. *See Pittman*, 816 F.3d at 426–27. Otherwise, a defendant could avoid trial indefinitely by firing or refusing to cooperate with counsel while telling the district court during the model *Faretta* inquiry that his decision to waive counsel was involuntary or that he did not understand what right he was waiving. *See Benchbook for United States District Courts*, *supra*, at 28. As a result, we have never required a district court to conduct the full *Faretta* inquiry before finding that a defendant's actions amount to a waiver of his right to counsel. *See Pittman*, 816 F.3d at 426–27. All we ask is that a district court act "within

11

the bounds of reason" to determine whether a defendant has been fairly warned about the risks inherent in proceeding pro se and that the defendant's conduct—if it continues—will require proceeding in that manner. *Id.* at 427.

Here, the district court met those marks. The court repeatedly warned Williams about the dangers of self-representation. It told him that conducting his own defense would be "a very difficult undertaking" in light of Williams's inexperience with criminal law. R. 216, PageID 3226. The court later reminded him that refusing to cooperate with his new attorney would be "unwise[]" and "detriment[al]" to his defense. R. 104, PageID 1225. Not only did the court explain self-representation's perils to Williams, but it also advised him that "a trained attorney would defend [him] far better than he could defend himself." *Id.* Fully warned about the pitfalls associated with proceeding on his own, Williams nonetheless chose to continue to engage in the conduct he was cautioned to avoid.

Likewise, each time the district court replaced Williams's appointed counsel, it reminded Williams that he was not entitled to unlimited appointments of counsel. Its final admonition is telling: "The Court strongly urges [Williams] not to engage in conduct . . . that might compromise the attorney-client relationship between him and his new attorney, because it **will** result in his waiver of his constitutional right to an attorney . . . ." *Id.* Through this admonition, the district court made Williams "aware of the consequences of persistent, unreasonable refusals to cooperate with appointed counsel" and "inform[ed] [him] of the difficulties of self-representation" prior to finding a waiver. *Pittman*, 816 F.3d at 427. Nothing more is required.

Alternatively, Williams encourages us to adopt the framework employed by some of our sister circuits, which, to his mind, requires the full *Benchbook* inquiry even for waivers by conduct. *See* Appellant Br. 31–33 (citing *United States v. Goldberg*, 67 F.3d 1092 (3d Cir. 1995); *United*

*States v. Allen*, 895 F.2d 1577 (10th Cir. 1990)). Yet we have already established the relevant test for this area of law: The district court must fairly inform a defendant about the dangers of self-representation and put the defendant on notice that further fractious behavior would amount to a waiver of the defendant's right to court-appointed counsel. *See Pittman*, 816 F.3d at 426–27. The district court did so here. Williams's *Faretta* argument thus fails.

III.

Williams also makes a due process argument. He alleges that the district court was biased against him, thereby depriving him of a fair trial.

We apply a presumption of impartiality when dealing with accusations of judicial bias, and the burden of overcoming that presumption rests with Williams. *See Coley v. Bagley*, 706 F.3d 741, 750–51 (6th Cir. 2013). To do so, Williams must point to something more than adverse "judicial rulings," which, standing "alone almost never constitute a valid basis for a [claim of] bias." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Instead, Williams needs to make us aware of "judicial remarks" that "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* And those statements must go beyond the court's "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what" individuals, "even after having been confirmed as federal judges, sometimes display." *Id.* at 555–56. In other words, the court's attempt to administer an orderly trial when faced with a disruptive litigant is not a due process problem even if those efforts come across as "stern and short-tempered." *Id.* at 556.

Here, the district court's conduct falls well below the level of antagonism toward Williams that would warrant recusal. To be sure, the court expressed frustration with Williams at times. But the court also gave Williams "leeway" on several occasions out of respect for his pro se status.

R. 224, PageID 3839, 3846, 3880. It likewise made sure that Williams had multiple opportunities to air all of his arguments and complaints. In other words, far from being biased against Williams, the district court made a commendable effort to ensure that Williams could meaningfully participate in his own defense while maintaining orderly proceedings.

Largely acknowledging as much, Williams instead focuses on the court's interjections during his opening statement, its warnings of punishment for Williams's conduct, and its denial of some of Williams's motions without oral argument. We see no evidence of bias. With respect to his opening statement, Williams does not point to specific comments that he believes reflect bias. Nor do we see anything in the record that suggests partiality. To be sure, the district court time and again had to remind Williams to abide by its rulings as well as correct misstatements Williams made before the jury. But that is not bias against Williams; it is "ordinary effort[] at courtroom administration" that, even if it sometimes reflects "impatience, dissatisfaction, annoyance, [or] even anger," does not amount to a due process violation. *Liteky*, 510 U.S. at 555–56.

Nor do the district court's threats to gag or remove Williams suggest partiality. The court's exasperation with Williams was understandable given his continued disruptive behavior. But the court never made good on its threats. And even had it done so, the Constitution permits a trial court to gag or remove "an obstreperous defendant" who does not comply with the orders regarding the administration of court proceedings. *Illinois v. Allen*, 397 U.S. 337, 342–44 (1970). In short, the district court's statements to Williams did not cross over from permissible attempts at maintaining courtroom order into "deep-seated . . . antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

True, as Williams notes, the district court denied some of his motions without substantial argument. But those motions were all renewals of motions the court had already denied after

extensive argument. In fact, the court, to its credit, often engaged in extended, multi-hour discussions with Williams about his motions even as Williams talked in circles and refused to answer the court's questions. We cannot fault the district court for refusing to relitigate issues tied to regurgitated, frivolous arguments. All things considered, Williams has not carried his burden to prove bias.

*     *     *     *     *     *

Williams's lack of cooperation with his attorneys and the district court made the administration of these proceedings challenging to say the least. At every turn, Williams stymied the court's and counsel's attempts to help him. His eventual pro se defense was a product of his own choices, not constitutional error. We therefore affirm.